## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

K.MIZRA LLC,

      Plaintiff,

v.

                                             Docket No.:
                                             **JURY DEMAND**

BROTHER INDUSTRIES, LTD. and
BROTHER INDUSTRIES (U.S.A.), INC.,

      Defendants.

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff K.Mizra LLC ("Plaintiff" or "K.Mizra"), for its Complaint with Jury Demand for Patent Infringement against Brother Industries, Ltd. and Brother Industries (U.S.A.), Inc. (collectively "Defendant" or "Brother"), alleging, based on its own knowledge as to itself and its own actions and based on information and belief as to all other matters, states as follows:

## I.    INTRODUCTION

### A.    Sharp and Its Innovations

1.    Sharp Corporation ("Sharp") is a Japanese multinational company that has for more than a century conceived, designed, manufactured and sold, first in Japan and then worldwide, various innovative products. Indeed, the company was founded in 1912 in Tokyo and takes its name from one of its founder's first inventions, the Ever-Sharp mechanical pencil. Sharp currently employs more than 50,000 people worldwide and has been inventing the future in numerous existing and emerging product categories for decades.

2.      For more than sixty years now, Sharp has been heavily involved in the electronics products business, developing the first Japanese-produced televisions in 1953, and its Mobile Communications Division created the world's first camera phone in 2000.  Sharp also was then investing heavily in its document product and solutions division, earning high praise and prestigious awards from various industry publications and insiders for innovations in printer, copier, and facsimile technologies it was developing and introducing to the market.  Indeed, many of these innovations changed these product categories forever and helped to establish multifunction printers, i.e., all-in-one copier, printing, faxing, and scanning devices ("MFPs"), as a mainstay of the modern office.  These products take many forms, with one such Sharp device being shown below:



3.     Sharp's MFPs were precision engineered to make device setup easier and faster than previously available and to provide easy-to-use, efficient, and effective multi-level document production and assembly functionality to the modern and typical office worker.  Sharp's integrated product design and engineering approach to developing these state-of-the-art MFPs resulted in providing those office workers increased workflow efficiency, exceptional image quality, and an industry standard ease of product operation, control, management, and maintenance, helping to take its customer's business to the next level of productivity and performance.

4.     Given its culture of innovation and recognizing that its industry changing concepts often were emulated by "Johnny-come-lately" competitors, Sharp took pains to document and protect its various MFP-focused inventions.  These took the form of, among other things, filing and prosecuting to issuance many patents covering various aspects of the technologies it had developed and incorporated over time into its various MFP products.  These patents were issued in many countries, including the United States, Germany, and Japan.  As is too often the case, though, these protections were not self-policing in the MFP industry, with many of Sharp's competitors having taken its patented technologies for themselves and incorporating them into their commercial MFP offerings, but without providing Sharp the economic credit deserved for its many, many efforts and advancements.  This case concerns just such a situation.

**B.     K.Mizra and This Action**

5.     K.Mizra is a patent licensing company run by experienced management.  The company focuses on high value, high quality patents with a global reach and owns patent portfolios originating with a wide array of inventors, including portfolios developed by well-known multinationals, such as IBM and ZTE, and from research institutes such as National Chiao Tung University and Nederlandse Organisatie voor Toegepast Natuurwetenschappelijk Onderzoek

(Netherlands Organization for Applied Scientific Research).  By focusing on high-quality patents, K.Mizra provides a secondary market for inventors to recoup their research and development investments and to continue their innovations.  K.Mizra offers licenses to its patents on reasonable terms and in this way plays a part in the development of the technologies that make all our lives better.

6.      Sharp transferred its MFP-focused patents to K.Mizra, which now brings this action to enforce these valid and subsisting United States patent rights.  K.Mizra is the owner by assignment of all rights, title, and interests in and to the patents discussed below ("the Asserted Patents").

## II.    PARTIES

7.      Plaintiff is a limited liability company organized and existing under the laws of the State of Delaware and maintains a business address at 777 Brickell Avenue, #500-96031, Miami, Florida 33131.

8.      Defendant Brother Industries, Ltd. is a corporation organized and existing under the laws of Japan with its principal place of business located at 15-1, Naeshiro-cho, Mizuho-ku Nagoya-shi, Aichi-ken, Japan 467-8561.

9.      Defendant Brother Industries (U.S.A.), Inc. is a corporation organized and existing under the laws of Delaware, with a principal place of business at 7819 North Brother Boulevard, Bartlett, Tennessee 38133.  Defendant has a registered agent at Corporation Service Company, 2908 Poston Ave., Nashville, Tennessee 37209-1312.  Brother Industries (U.S.A.), Inc. is a wholly-owned subsidiary of Brother Industries, Ltd.

10.     On information and belief, Brother Industries (U.S.A.), Inc. and Brother Industries, Ltd. have acted in concert with respect to the conduct complained of herein such that the conduct of one is attributable to the other and vice versa.

### III.   JURISDICTION AND VENUE

11.     This is an action for patent infringement under the patent laws of the United States, namely, 35 U.S.C. §§ 101 *et seq*., 271, 281, and 284, among others.  This Court has original subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331 and 1338(a).

12.     Defendant is subject to this Court's specific and general personal jurisdiction, pursuant to due process and the Tennessee Long-Arm Statute, due at least to its business in this forum, including at least a portion of the infringements alleged herein.  Furthermore, Defendant is subject to this Court's specific and general personal jurisdiction because Defendant maintains a place of business within Tennessee.

13.      Without limitation, within this state, Defendant has used the patented inventions thereby committing, and continuing to commit, acts of patent infringement alleged herein.  In addition, Defendant has derived revenues from its infringing acts occurring within Tennessee. Further, Defendant is subject to the Court's general jurisdiction, including from regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from goods and services provided to persons or entities in Tennessee.  Further, Defendant is subject to the Court's personal jurisdiction at least due to its sale of products and/or services within Tennessee.  Defendant has committed such purposeful acts and/or transactions in Tennessee such that it reasonably should know and expect that it could be haled into this Court as a consequence of such activity.

14.     Venue is proper in this district under 28 U.S.C. § 1400(b) because Defendant has committed and continues to commit acts of patent infringement in this district, including using, offering to sell, and/or selling the Accused Products in this district, including by Internet sales and sales via retail and wholesale stores, and because Defendant has a regular and established place of business in this district, including at 7819 North Brother Boulevard, Bartlett, Tennessee 38133.

## IV.     FACTUAL ALLEGATIONS

### A.     The Asserted Patents

#### 1.     U.S. Patent 7,064,874

15.     On June 20, 2006, the USPTO duly and legally issued U.S. Patent No. 7,064,874 ("the '874 Patent") entitled "Both-Side Document Reading Apparatus and Both-Side Document Reading Method" to Sharp.  Sharp assigned the '874 Patent to K.Mizra, and that Assignment is recorded beginning at Reel/Frame No. 054223/0499 of the USPTO Assignment database.  A copy of the '874 Patent is attached hereto as **Exhibit A** and incorporated herein, in its entirety, by reference.

16.     The '874 Patent discloses a both-side reading apparatus used, for example, in scanners, copiers, printers, facsimiles, or the like, and a both-side document reading method.  In one aspect of the systems and methods disclosed in the '874 Patent, an amount of the illumination light applied to the surfaces of a document is held constant until the reading operation at both the main and back surfaces of the document has been completed.  This allows both sides of a document to be read under constant reading conditions and prevents errors or artifacts that occur from variable illumination or opposing light sources.  Claim 18 of the '874 Patent addresses these concepts and states:

An image forming apparatus comprising a both-side document reading apparatus, the both-side document reading apparatus comprising:

a first reading portion, provided with a first light source, for reading one side surface of a document by emitting light toward the one side surface of the document by the first light source; and

a second reading portion, provided with a second light source, for reading another side surface of the document by emitting light toward the other side surface of the document by the second light source,

wherein the first and second reading portions are arranged so that a reading region of the one side surface by the first reading portion is arranged on an upstream side from a reading region of the other side surface by the second reading portion in a document transport direction, and

wherein the first light source is turned off after the document has passed through the reading region of the second reading portion.

17.     Brother has made, used, sold, offered for sale, and/or imported MFPs that infringe at least Claim 18 of the '874 Patent.

18.     For example, Brother MFP model MFC-L3770CDW is an image forming apparatus, *i.e.*, printer, that contains a both-side document reader capable of duplex scanning:





**MFCL3770CDW**

Compact Digital Color All-in-One Printer with 3.7" Color Touchscreen, Wireless and Duplex Printing and Scanning

- Duplex (2-sided) copying & scanning
- NFC "touch to connect" print & scan‡
- 30-sheet capacity multi-purpose tray

★★★★½   4.3 (1369)   Write a review   Ask a question

Your Price                    $499.99

WHERE TO BUY

19.     The MFC-L3770CDW printer contains an automatic document feeder ("ADF") flatbed scanner that contains the claimed first reading portion and first light source. The scanner lamp of the MFC-L3770CDW printer illuminates the upward-facing side of a document by emitting light onto that document that is read by a CIS unit.



20.     The claimed second reading portion of the MFC-L3770CDW is housed in the flatbed scanner.  Within the flatbed scanner, a CIS unit contains a second light source, a lamp, that emits light onto the other, downward-facing side of the document to read that surface.



21.     The MFC-L3770CDW is designed such that sheets of paper to be duplex scanned are placed in the ADF tray from which they are fed by rollers into the ADF.  By design, during duplex scanning, the document is transported in a single direction by the rollers—from the ADF tray, the document page is moved through the ADF and then past the surface of the flatbed scanner before being ejected into the ADF bin when scanning is complete.  In this document page flow, the ADF CIS unit is upstream of the flatbed scanner CIS unit.



22.     Both CIS units shut off simultaneously after the document has passed through the reading region of the flatbed CIS unit, and thus the ADF CIS unit is turned off after the document has passed through the flatbed scanner.



### 2.     U.S. Patent 7,449,274

23.     On November 11, 2008, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Patent No. 7,449,274 ("the '274 Patent") entitled "Toner for Electrostatic Image Development and Image Forming Method Using the Same" to Sharp.  Sharp assigned the '274 Patent to K.Mizra and that Assignment is recorded beginning at Reel/Frame No.

054223/0499 of the USPTO Assignment database.  A copy of the '274 Patent is attached hereto as **Exhibit C** and incorporated herein, in its entirety, by reference.

24.     The '274 Patent is directed towards a composition of toner where certain percentages of the toner particles fall within or outside of specified sizes, and the toner also includes an additive.  The '274 Patent toner composition has been shown to outperform other previously known toner compositions in a number of ways.  Claim 1 of the '274 Patent states:

> A toner for electrostatic image development, comprising toner particles in which not more than 13 percent by number of the toner particles have a particle diameter of smaller than 4 μm, not less than 20 percent by number of the toner particles have a particle diameter of 4 μm to 6 μm, not more than 2.0 percent by volume of the toner particles have a particle diameter of 16 μm or greater, wherein the toner particles have a volume average diameter of 4 μm to 9 μm and at least an external additive is added to the toner particles.

25.     Brother has made, used, sold, offered for sale, and/or imported toner cartridges that infringe at least Claim 1 of the '274 Patent.

26.     An exemplary infringing toner cartridge is the Brother TN436 toner cartridge, shown below:



11

27.    The Brother TN436 toner cartridge contains toner for electrostatic image development using a Brother printer or copier.  An independent third-party analysis of the contents of the Brother TN436 toner cartridge revealed toner particles in which at most $100 - 93.5 = 6.5$ percent by number of the particles within the cartridge have a particle diameter smaller than 4 μm, and at least 93.5 percent by number of the toner particles have a particle diameter of 4 μm or greater, as shown in the below chart:

| Particle Diameter μm | Brother TN _OEM Cartri _316.#m4 Number > | Number % > | Volume μm³ > | Volume % > |
|---|---|---|---|---|
| 1 | 56236 | 100 | 5577142 | 100 |
| 2 | 56236 | 100 | 5577142 | 100 |
| 3 | 55021 | 97.8 | 5567017 | 99.8 |
| 4 | 52580 | 93.5 | 5505180 | 98.7 |
| 5 | 40735 | 72.4 | 4891531 | 87.7 |
| 6 | 17752 | 31.6 | 2864965 | 51.4 |
| 8 | 606.2 | 1.08 | 267593 | 4.80 |
| 10 | 83.17 | 0.15 | 97611 | 1.75 |
| 12 | 40 | 0.071 | 68766 | 1.23 |
| 15 | 12 | 0.021 | 35449 | 0.64 |
| 17 | 6 | 0.011 | 23545 | 0.42 |
| 20 | 2 | 0.0036 | 8964 | 0.16 |
| 25 | 0 | 0 | 0 | 0 |

28.    The analysis further confirmed that the Brother TN436 toner cartridge comprises toner particles in which at least $93.5 - 31.6 = 61.9$ percent by number of toner particles having a diameter of 4 μm to 6 μm, as shown in the below chart:

| Particle Diameter μm | Brother TN _OEM Cartri _316.#m4 Number > | Number % > | Volume μm$^3$ > | Volume % > |
|---|---|---|---|---|
| 1 | 56236 | 100 | 5577142 | 100 |
| 2 | 56236 | 100 | 5577142 | 100 |
| 3 | 55021 | 97.8 | 5567017 | 99.8 |
| 4 | 52580 | 93.5 | 5505180 | 98.7 |
| 5 | 40735 | 72.4 | 4891531 | 87.7 |
| 6 | 17752 | 31.6 | 2864965 | 51.4 |
| 8 | 606.2 | 1.08 | 267593 | 4.80 |
| 10 | 83.17 | 0.15 | 97611 | 1.75 |
| 12 | 40 | 0.071 | 68766 | 1.23 |
| 15 | 12 | 0.021 | 35449 | 0.64 |
| 17 | 6 | 0.011 | 23545 | 0.42 |
| 20 | 2 | 0.0036 | 8964 | 0.16 |
| 25 | 0 | 0 | 0 | 0 |

29.     The analysis further confirmed that the Brother TN436 cartridge comprises toner particles in which at most 0.64 percent by volume of the toner particles have a particle diameter of 15 μm or greater, as shown in the below chart:

| Particle Diameter μm | Brother TN _OEM Cartri _316.#m4 Number > | Number % > | Volume μm$^3$ > | Volume % > |
|---|---|---|---|---|
| 1 | 56236 | 100 | 5577142 | 100 |
| 2 | 56236 | 100 | 5577142 | 100 |
| 3 | 55021 | 97.8 | 5567017 | 99.8 |
| 4 | 52580 | 93.5 | 5505180 | 98.7 |
| 5 | 40735 | 72.4 | 4891531 | 87.7 |
| 6 | 17752 | 31.6 | 2864965 | 51.4 |
| 8 | 606.2 | 1.08 | 267593 | 4.80 |
| 10 | 83.17 | 0.15 | 97611 | 1.75 |
| 12 | 40 | 0.071 | 68766 | 1.23 |
| 15 | 12 | 0.021 | 35449 | 0.64 |
| 17 | 6 | 0.011 | 23545 | 0.42 |
| 20 | 2 | 0.0036 | 8964 | 0.16 |
| 25 | 0 | 0 | 0 | 0 |

30.    The analysis further confirmed that the Brother TN436 cartridge comprises toner particles having a volume mean (average) diameter of 6.200 µm, as the below graph confirms:



31.    Finally, the Brother TN436 cartridge comprises toner in which an external additive comprising $SiO_2$ (silica) is added to the toner particles.  Silica is identified as an additive in the specification of the '274 Patent.

## 3. COMPOSITION / INFORMATION ON INGREDIENTS

| Ingredients | CAS number | Weight % | OSHA PEL | ACGIH TLV | Other |
|---|---|---|---|---|---|
| Carbon black (bound) | 1333-86-4 | 2.5-10 | | | |
| Styrene-Acrylate Copolymer | 26655-10-7 | 50-100 | | | |
| Styrene Acrylic Resin | | 2.5-10 | | | |
| Polypropylene | 9003-07-0 | 2.5-10 | | | |
| Fumed Silica | 844491-94-7 | 2.5-10 | | | Amorphous Silica: USA OSHA (TWA/PEL): 20 mppcf 80 mg/m3, ACGIH (TWA/TLV): 10 mg/m3. |
| | | | TWA: 15 mg/m3 (Total Dust), 5 mg/m3 (Respirable Fraction) | TWA: 10 mg/m3 (Inhalable Particulate), 3 mg/m3 (Respirable Particulate) | TRGS 900 (Luftgrenzwert): 10 mg/m3 (Einatembare partikel), 3 mg/m3 (Alveolengängige fraktion). UK WEL: 10 mg/m3 (Respirable Dust), 5 mg/m3 (Inhalable Dust). |

### 3.       U.S. Patent No. 7,840,165

32.     On November 23, 2010, the USPTO duly and legally issued U.S. Patent No. 7,840,165 ("the '165 Patent") entitled "Toner Replenishing Apparatus, Image Forming Apparatus, and Color Image Forming Apparatus" to Sharp.  Sharp assigned the '165 Patent to K.Mizra and that Assignment is recorded beginning at Reel/Frame No. 054223/0499 of the USPTO Assignment database.  A copy of the '165 Patent is attached hereto as **Exhibit E** and incorporated herein, in its entirety, by reference.

33.     The '165 Patent is directed to a toner replenishing apparatus that allows easy removal of toner replenishing containers (such as toner cartridges).  The claimed device includes displacement mechanisms that allow toner replenishing containers to be displaced from secure operative positions for removal and replacement.

34.     Claim 1 of the '165 Patent is directed to at least some of these concepts and states:

A toner replenishing apparatus comprising:

a toner replenishing container for accommodating toner to be replenished to a developing device;

a container holding member for holding the toner replenishing container in a detachable manner;

a displacement mechanism for displacing the toner replenishing container from a

position where the toner replenishing container is held by the container holding member; and

a retaining member for retaining the toner replenishing container securely in the container holding member,

wherein the displacement mechanism effects displacement of the toner replenishing container in conjunction with a release of the toner replenishing container from a retaining action of the retaining member, and

the displacement mechanism includes a hook portion formed in the retaining member and an engagement portion formed in the toner replenishing container, the engagement portion being engaged with the hook portion under a condition that the toner replenishing container is released from the retaining action of the retaining member.

35.    A Brother imaging unit such as the DR-730, combined with a toner cartridge such as a TN-760, is a toner replenishing apparatus.  The toner cartridge is a toner replenishing container for accommodating toner to be replenished to a developing device, *i.e.* the developing equipment in a Brother MFP.

36.    The DR-730 comprises a container holding member for holding the toner cartridge (the toner replenishing container).  The DR-730 holds the toner cartridge in a detachable manner. The toner cartridge can be inserted into and removed from the DR-730.



37.    The DR-730 has a displacement mechanism activated by the lock lever.  When the lock lever is pressed, the toner cartridge (toner replenishing container) comes out (is displaced) from the grooves of the DR-730 (container holding member) holding the toner cartridge (toner replenishing container).

38.    The DR-730 comprises a retaining member for retaining the toner replenishing container securely in the container holding member.  When the lock lever is in a locked position, the toner cartridge is securely retained within the DR-730.

39.    The displacement mechanism associated with the lock lever effects displacement of the toner cartridge in conjunction with a release of the toner cartridge from a retaining action of the retaining member.  When the lock lever is pressed, the toner cartridge is released (no longer retained securely) and removed (displaced) from the DR-730.

40.    The displacement mechanism includes a hook portion formed in the retaining

17

member. This is evident at least from the protruding engagement portion on the toner cartridge, which engages with the displacement mechanism under a condition that the toner cartridge is released from the retaining action of the retaining member.



### 4.     U.S. Patent 9,769,342

41.     On September 19, 2017, the USPTO duly and legally issued U.S. Patent No. 9,769,342 ("the '342 Patent") entitled "Electric Apparatus" to Sharp.  Sharp assigned the '342 Patent to K.Mizra and that Assignment is recorded beginning at Reel/Frame No. 054223/0499 of the USPTO Assignment database.  A copy of the '342 Patent is attached hereto as **Exhibit G** and incorporated herein, in its entirety, by reference.

42.     The '342 Patent is directed to an electric apparatus, such as numerous of Brother's MFPs, that have a control panel user interface that can exist in both active and power save states. The '342 Patent discloses a device and method that "wakes" the electrical device from a power save state if the device is in hibernation or sleep mode or initiates some user function if the device is in its operational state.

43.    Claim 1 of the '342 Patent is directed to at least some of these concepts and states:

An electric equipment including a reception unit configured to receive an instruction relating to functions of the electric equipment by an operation of a user and having operation states of a power conserving state in which power required for performing the functions thereof is limited and a normal state in which the power is not limited, the electric equipment comprising:

a signal output unit configured to output signals of different levels depending on the operation state when the reception unit receives the instruction from the user; and

a control signal unit configured to selectively output a return signal relating to a return to the normal state or an execution signal relating to an execution of a function corresponding to the instruction received by the reception unit, based on the signal output from the signal output unit.

44.    Brother has made, used, sold, offered for sale, and/or imported MFPs that infringe at least Claim 1 of the '324 Patent.

45.    For example, the Brother MFP model MFC-L8900CDW is an electric equipment that includes a reception unit (*i.e.*, touch panel in the control panel) configured to receive instructions related to the functions of the MFP.  A user can use the touch panel to carry out different printer operations (printing, scanning, etc.).



46.     The MFC-L8900CDW has at least two different operation states.  One is a power conserving state (*i.e.*, Sleep Mode or Deep Sleep Mode) and the second is the normal state (*i.e.*, the normal or "ready" mode). The Sleep Mode and Deep Sleep Mode limit the power supply/consumption for the MFP.

| Power Consumption (Average) | Peak | • Approximately 1230 W |
|---|---|---|
| | Printing [2] | • Approximately 600 W at 77°F (25°C) |
| | Printing (Quiet Mode) [2] | • Approximately 360 W at 77°F (25°C) |
| | Copying [2] | • Approximately 600 W at 77°F (25°C) |
| | Copying (Quiet Mode) [2] | • Approximately 370 W at 77°F (25°C) |
| | Ready [2] | • Approximately 75 W at 77°F (25°C) |
| | Sleep [2] | • Approximately 9.5 W |
| | Deep Sleep [2] | • (MFC-L8610CDW) Approximately 1.5 W<br>• (MFC-L8900CDW/MFC-L8895CDW/ MFC-L8905CDW) Approximately 1.7 W |
| | Power Off [2 3 4] | • Approximately 0.02 W |

47.     The MFC-L8900CDW touchscreen is connected to a signal output unit that outputs different levels of signals depending on the power state the unit is in. If the unit is not in sleep mode, the touch screen will output signals that select menu options. If the unit is in sleep mode, the touch screen will output a signal that wakes the unit up from sleep mode.

48.     If the equipment is in an energy saving mode (sleep) the signal output unit will send a certain signal, and if the equipment is in ready mode, it will send a different signal.  If the signal output unit sends a signal while in an energy saving mode, the control signal unit will cause the equipment to power up, or "wake up."  If the signal output unit sends a signal while powered up, the control unit will cause the unit to execute a function corresponding to the instruction received by the reception unit, such as selecting menu options.

### FIRST CLAIM FOR RELIEF
### (Count I – Patent Infringement of U.S. Patent No. 7,064,874)

49.     Plaintiff repeats and re-alleges the allegations above in Paragraphs 1 – 31 as if fully set forth herein.

50.     The '874 Patent includes 18 claims.  Brother directly infringes, either literally or under the doctrine of equivalents, at least Claim 18 of the '874 Patent by making, using, selling, offering for sale, and/or importing infringing MFPs that meet all limitations of at least Claim 18 of the '874 Patent, including but not limited to the MFC-L3770CDW MFP as shown in the '874 Patent Preliminary Claim Chart, attached as **Exhibit B** and incorporated herein by reference.

51.     Brother is thus liable for direct infringement of the '874 Patent pursuant to 35 U.S.C. § 271(a).

52.     At least as of the filing of this Complaint, Brother has knowledge of the '874 Patent and of Brother's infringement thereof.

53.     At least as of the filing of this Complaint, Brother's infringement of the '874 Patent is willful.

54.     Brother's acts of infringement occurred within this District and elsewhere throughout the United States.

55.     Brother is liable to Plaintiff in an amount that adequately compensates it for Brother's infringement in an amount that is not less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

56.     Plaintiff has been damaged and will suffer additional damages and irreparable harm unless Brother is enjoined from further infringement under 35 U.S.C. § 283.

## V.     SECOND CLAIM FOR RELIEF
### (Count II – Patent Infringement of U.S. Patent No. 7,499,274)

57.     Plaintiff repeats and re-alleges the allegations above in Paragraphs 1 – 14 and 23 – 31 as if fully set forth herein.

58.     The '274 Patent includes 7 claims.  Brother directly infringes, either literally or under the doctrine of equivalents, at least Claim 1 of the '274 Patent by making, using, selling, offering for sale, and/or importing infringing toner cartridges that meet all limitations of at least Claim 1 of the '274 Patent, including but not limited to the TN436 toner cartridge as shown in the '274 Patent Preliminary Claim Chart, attached as **Exhibit D** and incorporated herein by reference.

59.     Brother is thus liable for direct infringement of the '274 Patent pursuant to 35 U.S.C. § 271(a).

60.     At least as of the filing of this Complaint, Brother has knowledge of the '274 Patent and of Brother's infringement thereof.

61.     At least as of the filing of this Complaint, Brother's infringement of the '274 Patent is willful.

62.     Brother's acts of infringement occurred within this District and elsewhere throughout the United States.

63.     Brother is liable to Plaintiff in an amount that adequately compensates it for Brother's infringement in an amount that is not less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

64.     Plaintiff has been damaged and will suffer additional damages and irreparable harm unless Brother is enjoined from further infringement under 35 U.S.C. § 283.

## VI.     THIRD CLAIM FOR RELIEF
### (Count III – Patent Infringement of U.S. Patent No. 7,840,165)

65.     Plaintiff repeats and re-alleges the allegations above in Paragraphs 1 – 14 and 32 – 40 as if fully set forth herein.

66.     The '165 Patent includes 9 claims.  Brother has been and is directly infringing, either literally or under the doctrine of equivalents, at least Claim 1 of the '165 Patent by making, using, selling, offering for sale, and/or importing infringing imaging units, including but not limited to the DR-730 in conjunction with compatible toner cartridges as shown in the '165 Patent Preliminary Claim Chart, attached as **Exhibit F** and incorporated herein by reference.

67.     Brother is thus liable for direct infringement of the '165 Patent pursuant to 35 U.S.C. § 271(a).

68.     At least as of the filing of this Complaint, Brother has knowledge of the '165 Patent and of Brother's infringement thereof.

69.     At least as of the filing of this Complaint, Brother's infringement of the '165 Patent is willful.

70.     Brother's acts of infringement have occurred within this District and elsewhere throughout the United States.

71.     Brother is liable to Plaintiff in an amount that adequately compensates it for Brother's infringement in an amount that is not less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

72.     Plaintiff has been damaged and will suffer additional damages and irreparable harm unless Brother is enjoined from further infringement under 35 U.S.C. § 283.

## VII.     FOURTH CLAIM FOR RELIEF
### Count IV – Patent Infringement of U.S. Patent No. 9,769,342)

73.     Plaintiff repeats and re-alleges the allegations above in Paragraphs 1 – 14 and 41 – 48 as if fully set forth herein.

74.     The '342 Patent includes 3 claims.  Brother has been and is directly infringing, either literally or under the doctrine of equivalents, at least Claim 1 of the '342 Patent by making, using, selling, offering for sale, and/or importing infringing MFPs, including but not limited to the MFC-L8900CDWas shown in the '342 Patent Preliminary Claim Chart, attached as **Exhibit H** and incorporated herein by reference.

75.     Brother is thus liable for direct infringement of the '342 Patent pursuant to 35 U.S.C. § 271(a).

76.     At least as of the filing of this Complaint, Brother has knowledge of the '342 Patent and of Brother's infringement thereof.

77.     At least as of the filing of this Complaint, Brother's infringement of the '342 Patent is willful.

78.     Brother's acts of infringement have occurred within this District and elsewhere throughout the United States.

79.     Brother is liable to Plaintiff in an amount that adequately compensates it for Brother's infringement in an amount that is not less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

80.     Plaintiff has been damaged and will suffer additional damages and irreparable harm unless Brother is enjoined from further infringement under 35 U.S.C. § 283.

## VIII.     PRAYER FOR RELIEF

K.Mizra requests that the Court find in its favor and against Brother, and that the Court grant K.Mizra the following relief:

A.     Judgment that one or more claims of the Asserted Patents have been infringed, either literally and/or under the doctrine of equivalents, by Brother;

B.     Ordering that Brother, its officers, directors, agents, servants, employees, privies, representatives, attorneys, parent and subsidiary corporations or other related entities, successors, assigns, licensees, retail distributors, and all persons in active concert or participation with any of them, be preliminary and permanently enjoined from further acts of infringement of the unexpired Asserted Patents;

C.     Awarding damages in an amount to be proven at trial, but in no event less than a reasonable royalty, for Brother's infringement;

D.     Judgment that Brother account for and pay to K.Mizra all damages, including a reasonable royalty, and costs incurred by K.Mizra because of Brother's infringing activities and other conduct complained of herein, including an award of all increased damages to which K.Mizra is entitled under 35 U.S.C. § 284, including treble damages for any infringement found to be willful;

E.      Declaring this an exceptional case and awarding K.Mizra its attorneys' fees and costs in accordance with 35 U.S.C. § 285;

F.      Pre-judgment and post-judgment interest on the damages caused to K.Mizra by reason of Brother's infringing activities and other conduct complained of herein; and

G.      Such other and further relief as the Court may deem just and proper under the circumstances.

## IX.      DEMAND FOR JURY TRIAL

K.Mizra requests a trial by jury pursuant to Fed. R. Civ. P. 38.

Dated:  July 17, 2023                    Respectfully submitted,

s/Richard M. Carter
Richard M. Carter (TN Bar No. 7285)
Abigail Abide Stephens (TN Bar No. 35920)
MARTIN, TATE, MORROW & MARSTON, P.C.
International Place, Tower II
6410 Poplar Avenue, Suite 1000
Memphis, Tennessee 38119
Telephone: (901) 522-9000
Facsimile: (901) 527-3746
rcarter@martintate.com
astephens@martintate.com

Matthew C. Holohan (*pro hac vice* to be filed)
CO State Bar No. 40996
SHERIDAN ROSS P.C.
1560 Broadway, Suite 1200
Denver, Colorado 80202
Telephone: (303) 863-9700
Facsimile: (303) 863-0223
mholohan@sheridanross.com
litigation@sheridanross.com

*Attorneys for Plaintiff K.Mizra LLC*